Argued July 20, affirmed August 10, petition for rehearing denied
September 6, 1960

# STATE OF OREGON *v.* BODI

354 P. 2d 831

*Arthur V. Biggs,* Corvallis, argued the cause for appellant. On the brief were Biggs & Allan, Corvallis.

*John B. Fenner,* District Attorney, Corvallis, argued the cause for respondent. With him on the brief was J. Alfred Joiner, Deputy District Attorney, Corvallis.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, O'Connell, Goodwin and Millard, Justices.

GOODWIN, J.

Wayne Bodi appeals from a conviction of the crime of manslaughter.

The indictment accused him of involuntarily killing a four-and-one-half-month-old baby girl by willfully beating the child with his hands about the face and head, with sufficient force to cause bilateral subdural bleeding, described in the indictment as "hematomas".

Bodi, a 20-year-old unmarried male, was living with Clara Smith, a 31-year-old female, who was married to a third person. Both Bodi and Mrs. Smith testified that Bodi was the father of the deceased child. For the purposes of this appeal it is not necessary to question their testimony in this regard. The three had lived in a trailer in Glenbrook, Benton County, for about one week prior to the event which led to the trial and conviction under review.

There was testimony to the effect that the deceased child was in good health at all times until about 10:00 a. m. on the day of its death, Sunday, June 21, 1959. There was also evidence that the child had suffered several falls in the recent past, including a fall out of a stroller some 10 days before, a fall from the front seat of a 1948 Plymouth automobile to the floor thereof one or two days earlier, and at least one fall forward from a bed in a trailer house against a window sill as recently as the fatal morning. There was also general testimony concerning other bumps and bruises

which may have been occasioned by permitting the child to fall forward from a stroller on the last night of its life. There was further testimony that the child had received bumps from being pushed about in a stroller at the uncontrolled discretion of a six-year-old neighbor girl. The mother said she had noticed no change in the child's general health following any of said bumps or falls, but she testified that she had seen some bruises on the child's face. A neighbor also testified that she had observed bruises on the child's face during the week preceding the fatal Sunday.

About 10:00 a. m. on the Sunday in question, Mrs. Smith went to a neighbor's house to do some laundry. She swore that the child was perfectly normal when she left. Shortly before 12:00 noon, she testified, Bodi summoned her to the trailer, saying "there was something wrong with the baby." She returned, and from what she observed, she said she thought the baby was choking.

Mrs. Smith testified that she tried to induce the child to spit up, without success. She then tried mouth-to-mouth artificial respiration. Almost immediately it was decided to take the baby to a doctor and about noon the three arrived at the office of a Junction City physician who pronounced the child dead and advised Bodi and Mrs. Smith to take the body to the Benton County Coroner. This was done. The coroner caused an investigation to be made, and, two days later, an autopsy was performed.

Mrs. Smith swore that she did not know what caused the child to become stricken, and no other witness except the defendant saw the child between 10:00 a. m. and the emergency return of the mother a few minutes before the child expired. The defendant, ex-

cept for what he wrote in his confession, denied striking the child.

Circumstantial evidence tended to prove that the child died of brain damage as the result of tearing of tentorial membranes and bilateral subdural bleeding. The dura is the membrane which surrounds the brain; the tentorium is a part of the dura. The appeal challenges an alleged discrepancy in medical nomenclature between the word "hematomas", as used in the indictment, and the word "hemorrhage", which was used more or less interchangeably with "hematoma" by doctors and attorneys, including defense counsel, in the taking of testimony.

Several expert witnesses testified that the significant medical findings were torn tentorial membranes and massive subdural hemorrhage, which they described as fresh, unclotted bleeding between the dura and the brain. There were also colored slides which showed massive hemorrhages on two sides of the brain.

Passing the question of nomenclature for the moment, the evidence tended to show that the bleeding could only have been induced by a violent trauma. The evidence further tended to show that the trauma was of the blunt or distributed variety rather than sharp or focused, as there was no breaking of the skin or bone damage to the cranium. The medical findings indicated that a blunt force or forces had been applied to the head within 48 hours of death.

There are eight assignments of error, which will be considered in the order in which they fit into the trial below.

Bodi gave a signed statement to the district attorney. In his statement he admitted having slapped the child "I don't know how many times," in fits of rage

provoked by the child's crying. He stated that the slapping took place both on Saturday night and on Sunday morning. Bodi was not under arrest when he gave the statement, but he had been asked to come to the District Attorney's office to answer questions. After he gave the statement, he said, "May I go now?" He was then advised that he was under arrest.

Bodi assigns error to the ruling of the court which permitted the jury to pass upon the voluntariness of the confession, claiming the court should have excluded the confession as a matter of law.

■ We have examined the confession together with all of the testimony relating to the manner by which it was obtained. The evidence was in sharp conflict whether or not the police officers said to Bodi, as he claimed, "[put] that down on paper and put your signature on it * * * and there will be no trouble, and we will forget about it," or words to that effect.

If the defendant's story about the taking of his confession had been undenied, then, under the rule laid down in *State v. Wintzingerode*, 9 Or 153 (1881), and adhered to since, the confession would have been defective and it would have been error to permit the jury to consider it. However, the defendant's version of the taking of the confession was disputed by the officers. They swore that his statement was entirely voluntary and that no threats or promises had been made. It was within the trial court's discretion whether to submit the signed statement to the jury along with the evidence concerning the giving of the statement. It was for the jury to decide whether the confession was voluntary and trustworthy. *State v. Nunn*, 212 Or 546, 554, 321 P2d 356, and cases collected therein. No error was committed in receiving the confession.

The second principal question on this appeal is whether the state introduced enough evidence of the *corpus delicti* to take the case to the jury without the confession.

ORS 136.540 (1) provides in part, "nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed."

■■ The quoted provision of the code does not require the state to prove its case beyond a reasonable doubt independently of the confession. *State v. Wilkins*, 72 Or 77, 142 P 589. The statute means only what it says. In this case, it required the state to prove by evidence, other than the confession, that the child met its death by criminal means. If the evidence, apart from the confession, was equally consistent with the defendant's theory that the child met its death by accidental means, then the confession could not aid the state's case. ORS 136.540 (1), supra.

■ The evidence was sufficient without the confession to present a question for the jury whether a criminal act was the cause of death. The jury could have found (1) the child was in good condition two hours before its death; (2) severe hemorrhage resulting from torn membrane within the cranium caused death; (3) intracranial damage was inflicted within 48 hours of the time of death; (4) the child could not, after having sustained the injuries, continue to appear normal even to lay persons; (5) injuries of the kind found could not have been either: (a) self-inflicted, or (b) the result of the ordinary bumps and bruises caused by falling out of a stroller, from a bed, or from a car seat onto a floor.

The autopsy findings contained ample evidence to make out the *corpus delicti* when tied to other testi-

mony in the case which tended to prove that the child had slept normally the night before its death, and that the child was considered by the mother to be normal when she left to do her wash. The pictures of the battered child, and the testimony of the doctors that medical probabilities ruled out accidental injuries of the kind relied upon by the defense, made a case from which the jury could find that some person had applied sufficient force to the child's face and head to tear the tentorial membranes and break the blood vessels as described by the doctors. The medical opinion evidence put on by the state was that the child could not have remained conscious very long after the injuries were inflicted, and therefore the injuries had to have been very recent, under all the evidence.

Witnesses favorable to the defendant described bruises which they had seen on the child's face several days prior to the date of death. Medical experts who examined the body found only fresh bruises, according to their testimony. The conflict in the evidence between lay witnesses and medical witnesses concerning the description of bruises was a conflict only the jury could resolve. The medical opinion evidence corroborated the autopsy findings which tended to show that the trauma was recent and violent.

The medical experts did not rely upon the facial bruises to establish non-accidental trauma, but rather relied upon the severity of the internal destruction. The superficial bruises were some evidence of the time of the trauma. The establishment of non-accidental trauma, which the state had the burden to prove, was by opinion evidence only, but it was by opinion evidence entitled to be believed by the jury.

██ The defendant assigns error to the admission in evidence of a second statement dictated by him into

a recording device and replayed for the jury. The statement was actually an interview with the district attorney. It was first heard by the trial court in chambers, and was ruled admissible. It was not transcribed in the record as it should have been, but the recording was received in evidence and we have heard it replayed. The recording contained nothing directly incriminating, but on the contrary was at least partially self-serving. The defendant in the recorded statement denied knowledge of the cause of the child's injury. The defendant speculated in the recording that the child may have taken pneumonia from swimming. The defendant made a timely objection that the recording was not relevant to any issue in the case.

The state contended that the recording was admissible because it proved that the defendant was alone with the child, by his own admission, at the time the state claims the child received its mortal injuries. The defense correctly objected that the presence of the defendant alone with the child was irrelevant to prove *corpus delicti*. The alleged ground of admissibility was debatable. No inference of criminal misconduct can be drawn from the fact, by itself, that a father is alone with his own child. *State of Oregon v. Watts,* 208 Or 407, 301 P2d 1035.

The statements made in the interview were relevant for a very limited purpose at the stage of the trial when the offer was made, during the state's case in chief. The defendant had said in the statement that he was alone with the child. This was cumulative, because the state had established that fact by the mother's testimony. The state could not rely upon the fact to prove *corpus delicti,* but the evidence was relevant to prove opportunity to commit the crime. The state had the burden of proof on every allegation of the

indictment, and while cumulative, the evidence was not prejudicial.

The state also might have used the recording in rebuttal, because it contained inconsistent statements which tended to impeach the defendant on minor details of his testimony given later in the case. When offered, however, the exhibit was not yet competent for rebuttal purposes. The exhibit merely prolonged the trial; it did not constitute error. This assignment of error must therefore be disregarded.

■ The next assignment of error challenges the ruling of the trial court in refusing to dismiss the indictment because of an alleged variance between the indictment and the proof. The indictment described the cause of death as "sub dural hematomas", and the proof by the state's medical experts tended to show that the cause of death was subdural hemorrhage. After reading the entire transcript, this court is of the opinion that the variance, if any, was not such as to mislead either the defendant or the jury.

As testified by one of the defendant's witnesses, a hematoma is a collection of blood, either in a clot formed by chemical changes in the blood, or by the encapsulation of blood in a swollen condition surrounded by some other membrane, as in a tumor. A hemorrhage, on the other hand, is a free-flowing bleeding, ordinarily accompanying the bursting or tearing of the wall of a blood vessel. The two are not, however, mutually exclusive. If the flow of blood collects between two layers of tissue, then it may be called a hematoma.

One of the definitions of "hematoma" in a standard reference reads: "a circumscribed subdural effusion of the blood occurring in layers." Dorlan, The American

Illustrated Medical Dictionary (W. B. Saunders Company, Philadelphia and London, 22d ed 1951) 656. Until the dura was peeled off in the autopsy to expose the surface of the brain, the above dictionary definition accurately described the condition existing within the cranium.

The consensus of the medical-legal text-writers appears to be that a hemorrhage also becomes a hematoma if the victim survives the onset of hemorrhage long enough for the blood to stop flowing freely and to create a clot. The Cyclopedia of Medicine, Surgery, Specialties (F. A. Davis Company, Philadelphia, 1960 ed) describes subdural hematoma under "Hemorrhage, Intracranial, and Hydroma," in Vol. 6, p 75, as follows:

"This is a collection of blood situated between the dura mater and the pia arachnoid covering the brain. The blood is usually liquid, but may become organized into a clot. Subdural hematomata may be caused by rupture of the corticodural blood vessels due to sudden acceleration or deceleration of the brain within the cranial cavity, particularly if the impact is transmitted in the antero-posterior plane."

Other works use the term hematoma to describe the collection of blood between the dura and the brain, or within the layers of the dura itself, without regard to any particular time element. See, for example, Brooke, In the Wake of Trauma (Callaghan & Company, Chicago 1957) 177, where the writer describes both arterial and venous bleeding as producing hematoma in the epidural and subdural regions. And see generally the chapter on *Blunt Force Injuries of the Head,* in Gonzales, Vance, Helpern & Umberger, Legal Medicine, Pathology and Toxicology (Appleton-Century-Crofts, Inc., New York, 2d ed, 1954) beginning

on page 261 and especially at pages 277-286. The later reference describes the changes which occur if the victim survives long enough for the hemorrhage to organize into a clot.

The defendant was not misled by the nomenclature in the indictment. All the attorneys and medical witnesses used the terms hematoma and hemorrhage interchangeably throughout the trial. There was no variance between the pleading and proof, and there was no surprise. The able defense counsel, by their cross-examination of the medical experts, revealed that they were well informed in the use of the relevant medical terms.

Other assignments of error challenge rulings of the court which denied the defendant a new trial, the motion for which relied principally upon legal propositions dealt with in connection with the assignments of error previously noted.

There was one further point made in connection with the motion for a new trial. The defendant claimed surprise, saying that he was prepared to defend against the allegation in the indictment which charged that the injuries were inflicted on or about June 20, 1959, and that such injuries resulted in death on June 21, 1959. He claims that he was unable to defend against evidence tending to show that the injuries were in fact inflicted on June 21. In this connection, it is apparent that the state relied upon the confession of the defendant in drawing the indictment.

The confession stated that the defendant slapped the child both on Saturday night (June 20) and again on Sunday morning (June 21). No eyewitness testified to the events described in the indictment or in

the confession. The medical evidence tended to show beyond reasonable doubt that the fatal injuries had been inflicted by some one within a period of 48 hours preceding the death of the child.

With the medical evidence proving the *corpus delicti,* and the defendant's confession advising the state who committed the crime, and approximately when it was committed, the defendant cannot be said to have been prejudiced by the allegation of time laid in the indictment. The allegation that the injuries were inflicted on or about June 20, 1959, was consistent with the confession as well as with the other evidence in the case. The words "on or about" are certainly broad enough to cover the events on both days. Having fixed the time in his own confession, the defendant cannot claim surprise when the indictment takes him at his word. The jury was entitled to find that the confession was both voluntary and trustworthy.

There being no error in the record, the judgment is affirmed.