Argued January 3, reversed and remanded March 15, 1967

ALFRED CHARLES DORSCIAK, *Appellant, v.*
GLADDEN, *Respondent.*

425 P. 2d 177

234

*Lawrence A. Aschenbrenner,* Public Defender, Salem, argued the cause and filed briefs for appellant.

*David H. Blunt,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before PERRY, Chief Justice, and MCALLISTER,

O'CONNELL, GOODWIN, DENECKE, HOLMAN* and REDDING, Justices.

DENECKE, J.

In 1962 the plaintiff pleaded guilty to the crimes of rape of daughter and contributing to the delinquency of a minor. He subsequently filed a petition for post-conviction relief contending, among other things, that his confession and plea of guilty to the rape charge were not voluntarily or understandingly made. He does not seek relief from the contributing conviction. The post-conviction court held a hearing and denied the petition.

We hold that the confession was not voluntarily made.

The defendant was 43 years old at the time of his conviction; he had a seventh grade education. He had no prior criminal record.

The defendant was arrested on March 28, 1962, under a warrant issued pursuant to an indictment for rape of daughter. He was taken to the county courthouse and interrogated for approximately one hour by a deputy district attorney and a deputy sheriff. The interrogation was taped; therefore, there is no dispute as to what was said. Ultimately the defendant stated he had sexual relations with his daughters.

The defendant remained incarcerated until April 2, 1962, when he was arraigned and pleaded guilty to both charges. During his incarceration only a minister visited him; however, there is no evidence that others could not have communicated with him. He was never brought before a magistrate as ORS 133.550 requires. He never had the advice of counsel.

---

* Holman, J., did not participate in the decision of this case.

At the arraignment the court informed him that if he desired the court could appoint an attorney for him. The defendant stated he did not want an attorney. When the defendant indicated he wanted to waive the time given to him to plead and make his plea at that time the court asked, "Do you do that of your own free will and without any promises of any kind?" The answer was, "Yes." The trial court informed the defendant that "this is a serious charge." The district attorney made a statement of the charged crime and thereafter the defendant said he did not care to make any statement.

Before the interrogation commenced defendant was advised of his right to remain silent and to have counsel; however, when the defendant asked for counsel, the following occurred:

"Dorsciak: I think that maybe I see a lawyer and then if he tells me to, you know, that the judge does that, well that's different, but I've got to know, I've got to know for sure.

"Conn: Well, I'm certain that the attorney will tell you that—

"Dorsciak: If I could just talk to one just for a minute, he don't have to take the case, or anything like that, if I could just talk to him and ask him some questions—

"Conn: Well, you'd have to go through proceedings for that or else make arrangements for yourself.

"Tankersley: Well, you understand that you are talking to an attorney now?

"Dorsciak: Yes.

"Conn: I'm the prosecuting attorney and I'm not trying to be unfair and I don't care whether I have convictions or don't but I want to be convicted [sic] [convinced] in my own mind that— * * *."

The defendant repeatedly told the interrogators he did not want any publicity to embarrass his daughters. He was told there would be a lot of publicity if there were a trial; however, this could be avoided if he would tell what happened.[1]

The interrogators also told the defendant that if he both confessed and pleaded guilty the judge would be easier on him than if he did not plead guilty or if he would not tell what happened.[2]

---

[1] For example, he was told: "The only thing—if you actually, seriously are concerned about helping your daughters, the whole thing I feel is for you to sit here and tell me the story. Your version of these things and what took place and why and that will end the matter."

[2] "Tankersley: You can put yourself in the position of the judge. We'll use a hypothetical case of a hungry man stealing a loaf of bread. Say he's caught with that loaf of bread and then he goes before the judge and he says I stole the bread and won't say why. You can see what the judge is going to think. However, if he goes in and he tells the judge 'I took the loaf of bread. I was hungry. I've had nothing to eat for three days.' It's going to make a difference. There's a reason, generally, there's a reason for every act that a person does.

"Conn: There's another approach to this too, also, especially on a guilty plea, is the court will ask the District Attorney as to your attitude and you understand our penal system is not a punishment system, it's a rehabilitation plan, is what it is, based on this idea. And if you get a criminal who comes forward, even though he pleads guilty, if he doesn't show that he is cooperating fully and willing to be open about what he's done and then there's less chance of his being rehabilitated. Where if he's come forth and said, 'Okay, I've done this thing' and give the various reasons why he thinks he has, then the court's more inclined to think, 'Well, here's a person that can be brought back to the road of social mores.' You see? Where if you withhold and the District Attorney has to say, 'Well the man says he did, but that's it,' then he, the judge, then sitting in the position of sentencing a man who, if there's a hope for this man being rehabilitated or is it just a matter of getting him out of society. And here you sit saying inferentially 'Well these things went on, and I don't want to discuss them but I don't want any publicity for my daughters, so I'll just plead guilty.' Now this is not showing a man that sees what's taking place and sees where he's at right now and what has to be done and possibly psychiatric care is going to help you. I don't know."

The interrogators told the defedant that "it was up to us to a degree" to determine if the defendant were to receive any psychiatric assistance and that to make this determination he would have to tell them what happened.[8]

The interrogators repeatedly told the defendant they were trying to help him but they could not do so unless he told them what happened.[9]

---

[8] "Tankersley: There's an element here I think you're missing. See in a case of this, I think it's customary that you be given an opportunity to see a psychiatrist if you want it. Now, the thing that bothers me, do you feel that these acts are normal? That's quite an important point, and that's why we ask these questions. It's up to us to a degree to decide which way it goes. Do you think that you need psychiatric help?

"Dorsciak: I don't think I could tell. I don't think I could answer that. All I know is that—myself, truthfully—maybe shock you fellows, I don't know, but truthfully, I don't feel any guilt.

"Tankersley: Well, that's what we're trying to get to, that's why I say, do you think that it's wrong. If you don't think it is let us know it.

"Dorsciak: I don't feel any guilt. If it was something like I would beat on them, treat 'em bad, deny 'em, like that, I would think maybe that was wrong. But I don't feel no guilt, if that's what you're trying to get to.

"Conn: No, we're not asking for guilt. As Mr. Tankersley stated, if you—

"Dorsciak: No, if I thought it was wrong, I'd feel guilty or something, wouldn't I?

"Conn: Well, if you don't feel guilty why do you hesitate to talk about it?"

[9] "Conn: Well a question in my mind exists whether you are normal.

"Dorsciak: Well I think so.

"Conn: You work at * * *, we know that. Your reactions appear rational, but, this is the first time I've ever seen you. I would just like—and I can't make no decision without knowing the background on the thing. Not that I'm a psychiatrist or am putting myself in a position with a psychiatrist, but it makes a big difference to us on what charge is actually filed you see. If you're a sick man, we don't want you upstairs.

"Dorsciak: Upstairs?

"Conn: Yes, in jail.

"Dorsciak: Oh. Well, I'd have to be there anyway. One way or the other.

The fact that the defendant's request for counsel was ignored may be enough to vitiate the conviction if *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L ed2d 694 (1966), were applicable, but it is not applicable as the conviction in this case was several years before *Miranda* and its precursors. *Guse v. Gladden,* 243 Or 406, 414 P2d 317 (1966). However, "* * * the fact that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made." *Davis v. North Carolina,* 384 US 737, 86 S Ct 1761, 16 L ed 895, 898 (1966). In the present case defendant was advised of his right to counsel; however, *Miranda* elaborated upon this right as follows: "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." 16 L ed2d at 707. It appears that this mandate was violated by the law enforcement officers.

Likewise, the voluntariness of a confession is suspect if it stems from an interrogation which was substituted for the statutory procedure requiring an accused to be taken before a magistrate without delay. ORS 133.550.

In *State v. Ely,* 237 Or 329, 334, 390 P2d 348 (1964), we summarized:

"Taken as a whole, the evidence put on by the state tended to prove that the teacher, when con-

---

"Conn: Well you would for awhile, but my Lord man, we're trying to help you.
"Dorsciak: I know.
"Conn: You're writing your own ticket.
"Dorsciak: I know—."

fronted by charges that he had molested a child, agreed to sign a confession. However, he was told that, while the confession would be used to keep him from teaching again, his employers and the parent of the wronged child planned no criminal prosecution.

"The defendant could have believed that if these three men would not prosecute him no one else was likely to do so. The state's own testimony, therefore, would support a finding that the confession was induced by an express or implied promise of immunity from prosecution. Such a confession, if so given, would be involuntary as a matter of law. *State v. Bodi,* 223 Or 486, 491, 354 P2d 831 (1960)."

In this case there were no representations of immunity, but there was a representation that the court would be more lenient if defendant confessed and pleaded guilty.

In *State v. Schwensen,* 237 Or 506, 521, 392 P2d 328 (1964), we stated in effect that if the interrogating officer's testimony was that "he held out to the defendant the false hope that if he changed his previous statement he would not be charged with murder, but only with rape," the statement made in response to such representation would be considered involuntary.

■ We further stated in *State v. Schwensen,* supra: "The rule is well-established in this state that a confession of guilt is prima facie involuntary, and, therefore, a burden is placed upon the state to show that it was voluntarily made *without the inducement of either fear or hope.*" (Emphasis added.) 237 Or at 522.

■■ The state's own evidence establishes that the statement was not made "without the inducement of either fear or hope." The hope of leniency from the judge if the defendant made a statement was held out.

The fear of publicity about his daughters if he did not make a statement was emphasized by the interrogators. These tactics by the interrogators, occurring in the context previously described, lead us to the conclusion that the defendant has failed to overcome the prima facie involuntariness of the confession. The post-conviction court's finding to the contrary is not supported by the uncontradicted evidence.

The remaining question is whether the "plea of guilty was fatally tainted by" the involuntary confession. *Gladden v. Holland,* 366 F2d 580, 583 (9th Cir 1966). In *Pennsylvania ex rel Herman v. Claudy,* 350 US 116, 76 S Ct 223, 100 L ed 126 (1956), the court stated:

> "Our prior decisions have established that: (1) a conviction following trial or on a plea of guilty based on a confession extorted by violence or by mental coercion is invalid under the Federal Due Process Clause;  *  *  *." 350 US at 118.

In that case the state court had not held a hearing upon the petition for a writ of habeas corpus. The court ordered it remanded for a hearing and observed: "It is entirely possible that petitioner's prior confession caused him, in the absence of counsel, to enter the guilty plea." 350 US at 122.

In *Chambers v. Florida,* 309 US 227, 60 S Ct 472, 84 L ed 716 (1940), two of the defendants pleaded guilty two days after a coerced confession had been obtained. Two other defendants allegedly involved in the same crime pleaded not guilty and subsequently one of these changed his plea to guilty. The other was tried, the coerced confession was introduced, and he was convicted. On certiorari to the state supreme court the court held that the confessions were coerced

and reversed all the cases without remanding. The court did not discuss whether the coerced confessions induced the plea of guilty; apparently, it assumed they did.

*Richardson v. Williard,* 241 Or 376, 406 P2d 156 (1965), is not contrary to these decisions. In that case the defendant was represented by counsel. He gave a confession. "He now claims that he would not have plead guilty if he had then known that the confession might have been inadmissible because of our later decision in *State v. Neely,* 1965, 239 Or 487, 395 P2d 557, 398 P2d 482." 241 Or at 378. We held: "Whether or not defendant knew the confession was admissible was irrelevant because the plea of guilty with the advice of counsel was a judicial admission of all the material allegations of the indictment in a most indisputable form." 241 Or at 378.

In the present case the petitioner did not have counsel; the illegality of the confession directly affected its trustworthiness. Neither factor was present in *Richardson v. Williard,* supra. Prior to *Richardson v. Williard* we had taken a course consistent with that prescribed by the United States Supreme Court. In *Huffman v. Alexander,* 197 Or 283, 323, 251 P2d 87, 253 P2d 289 (1953), this court stated: "A plea of guilty is a judicial confession of guilt and comes within the established rule that the Constitution of the United States stands as a bar against the conviction of any person in an American court by means of a coerced confession."

In *Gladden v. Holland,* supra, the federal district court found both that the confession was involuntary and the plea of guilty was brought about by the making of the confession. It was also found that seven hours after the confession the defendant was convicted

and sentenced. In the present case four days elapsed between the confession and the entering of the plea.

At the post-conviction hearing the petitioner testified that one reason he pleaded guilty was to avoid publicity. The petitioner denied he was guilty of any crime against the daughter he pleaded guilty to raping although he admits he was guilty of contributing to the delinquency of the other daughter. The petitioner testified that one reason he pleaded guilty, did not ask for an attorney, and did not make any statement in court when asked by the court was that it appeared useless as he had already signed a confession.[9]

The court in *Gladden v. Holland,* supra (366 F2d at 583), pointed out: "The problem is analogous to that presented when a second confession, not itself imbedded in coercive circumstances, is claimed to be vitiated by an earlier coerced confession." We had this problem in *State v. Keller,* 240 Or 442, 449-450, 402 P2d 521 (1965). Mr. Justice HOLMAN there commented:

"As one studies the problem of the extent that a confession taken without constitutional safeguards contaminates a subsequent confession ob-

[9] "Now the judge asked you three times whether you wanted an attorney and you said no each time?

"A Can I answer that question?

"Q Yes, I wish you would.

"A At the time I was saying no to all these things I had already made a statement and I was already assured if I was going to plead innocent there was going to be a trial to bring out the truth and that is one of the things I didn't want.

\* \* \* \* \*

"Q Now at the time the charge was read to you in open court why did you say nothing about it them? ["I]t refers to charge of rape which petitioner denies and testified he was not aware was being made until the charge was read upon arraignment.]

"A Because I had already signed a statement and I didn't have no attorney. \* \* \*""

tained after being informed of his right to counsel and to remain silent, the more it appears that no rule of simple application may be laid down. The question must be one of fact in each instance. * * *"

In *State v. Keller,* supra, our holding on this issue was:

"* * * When the only evidence in the record indicates that similar confessions have previously been taken under circumstances where defendant's rights have not been preserved, we cannot in fairness to the defendant conclude that the state has discharged its burden of showing the subsequent confession, taken shortly thereafter, was admissible. * * *" 240 Or at 450.

The trial court in the present case made a finding: "* * * [H]e [defendant] gave the plea without any threats, coercion, promises or inducements. * * * He entered his plea for what he considered good reasons and not because of any medication, lack of medication or because of nervousness." The trial court held that the confession was voluntary and, therefore, did not make a finding on the issue of whether the plea was made because defendant had already confessed in a statement which we here hold to be involuntary.

The question of determining whether a defendant was induced to plead guilty because he had previously made an involuntary confession is difficult to answer, just as is the problem of whether a second confession was made because a first, but involuntary or otherwise inadmissible, confession had already been given. In *State v. Keller,* supra, we held that upon the evidence presented the second confession was tainted as a matter of law. We conclude that a similar rule is the

most feasible method for determining the similar problem we have in this case.

When the essential facts are that an involuntary confession was secured from the defendant and subsequently he pleaded guilty to the crime confessed, and these are the facts here, the guilty plea will be presumed tainted by the confession and the plea will be deemed involuntary until the state has overcome such presumption. Evidence could be introduced tending to prove that a plea of guilty would have been entered regardless of the prior involuntary confession, but there is no such evidence in this case.

The cause is remanded to the circuit court for the county of original conviction for such further proceedings as may be appropriate.

Reversed and remanded.

PERRY, C. J., dissenting.

I am unable to agree with the conclusions reached by the majority.

The evidence produced by the petitioner and the state in the post conviction hearing clearly establishes the reason the petitioner entered the plea of guilty to rape of his daughters.

The opinion of the majority first deals with the question of the voluntariness of a confession and statements made by the petitioner which results in a finding by this court that the confession and statements were involuntary.

Neither the confession nor the statements made by the petitioner were ever offered or attempted to be offered to establish his guilt. There could be, therefore, no violation of his constitutional rights under the Fifth Amendment of the Constitution of the United

States. The case of *State v. Schwensen,* 237 Or 506, 521, 392 P2d 328, where the confession was offered in evidence to establish guilt, has no application.

Assuming the confession and statements were illegally obtained in violation of the petitioner's constitutional rights, the sole question that could then be presented to the trial court as to the confession and statements is,—did he, because of such violation, waive his right to counsel and enter his plea of guilty to the crime charged?

The petitioner in his brief states "[t]here is no evidence that this tainted confession did not induce his guilty plea."

Assuming that the confession and statements made were tainted and that the burden of proof is upon the state to establish the fact that these prior actions did not taint the waiver of counsel and the guilty plea, the petitioner's statements at the trial clearly show that these statements of guilt previously made had no bearing upon his determination to waive counsel and enter a plea of guilty. A search of the records in the trial court shows that petitioner never testified that his prior statements in anywise induced his later actions. He was questioned by the public defender representing him as to why he waived counsel and entered his plea and he gave the following answers:

"Q Did your entry of the guilty plea to these two charges, was that in any way influenced by the possibility of publicity, bad publicity for your daughters?

"A Would you say that again. I didn't hear it all.

"Q Were you trying to avoid bad publicity for your daughters by entering your guilty plea?

"A Yes, that is the thing I was trying to stop,

this publicity, this talk of going to court and so forth.

"Q Cross examine.

"CROSS EXAMINATION BY MR. THOMPSON:

"Q Mr. Dorsciak, you state that you were trying to stop this publicity or anything like that, of this going to court, that is correct, isn't it?

"A Yes.

"Q Was this one of the foremost reasons for doing what you did?

"A Yes."

His contentions in the trial court are stated in his petition as follows:

"That petitioner's imprisonment was and is illegal, and the proceedings as set forth resulted in the substantial denial of the petitioner's rights as follows:

"A That petitioner was denied his right to counsel under the Sixth and Fourteenth Amendments of the Constitution of the United States, and Article I, Section 11 of the Constitution of the State of Oregon, in that petitioner did not voluntarily and understandingly waive his right to counsel.

"B. That petitioner was denied due process of law under the Fourteenth Amendment of the Constitution of the United States, in that he did not voluntarily and understandingly enter a plea of guilty to the charge for which he is imprisoned.

"C. That petitioner's right against self-incrimination was violated under the Fifth Amendment of the Constitution of the United States and the due process clause of the Fourteenth Amendment in that petitioner was not advised, nor did he know of his constitutional right to remain silent at the time his purported confession was made."

The trial court found as a fact, and this court agrees, that at all times the petitioner was advised of his right to counsel and of his right to remain silent.

The tape recording of the interview with the officers, introduced into evidence by the petitioner, discloses some of these facts and the reason in the mind of the petitioner that prompted his waiver of counsel and his plea of guilty. This occurred before the petitioner admitted to any act of rape:

"Point 11: . . . until you are arraigned and only then, just charged, whatever that charge might be . . . no particulars. No particulars released until we come into open court. In other words if there's a court battle . . . I have no idea of how serious this matter could be. Well, contributing to the delinquency of a minor . . . five years . . . maximum penalty. Even so, even so . . . the girls be protected. *Anywhere between nothing and life on the one and the other . . . and five years.* You see we don't give an estimate on these things . . . we just don't do it for that reason . . . (Emphasis mine)

"Dorsciak: I believe that . . . it's a hard decision to say but it seems to me that *even if it was life it would still be better.* (Emphasis mine)

"Conn: It's my concensus that . . . have any trouble proving the case and I think we have very strong substantial evidence which would be enough to prove the case and . . .

"Dorsciak: Well I'm not, I'm not . . .

"Conn: . . . argue one way or another. If you are concerned about publicity.

"Dorsciak: I am for the girls, not for myself. I am for the girls though.

"Conn: Well, whatever your motive is for not wanting publicity this type of trial will naturally be a tremendous news item.

"Dorsciak: I don't want that for the girls. I sure don't.

"Conn: The thing that we're trying to find out is that if you decide that you want to avoid it the thing to do is to tell us about it and what happened . . .

"Tankersly: Well the thing of it is this, these warrants are always obtained as a result of talking to one side. Now we've been in this business for some time and we know that there are two sides to everything. We'd like to hear your side. Because otherwise all we can do is have an unfair . . . and naturally our opinion will be unballanced. So we'd like to have the same thing from you that we have from them.

"Dorsciak: Is it required?

"Tankersly: No.

"Conn: You don't have to tell us a thing but we'd like to have it so that we can make a better decision. We don't want to be unjust with a person. All we want is the truth. The bottom to all of this.

"Dorsciak: Well, like I say, the girls come first with me always. Everything I ever done I guess, I done for them. That's why I don't want to have any publicity. If I have to . . . if I have to plead guilty to avoid that I would, very definitely.

"Conn: Well we're certainly not wanting you to plead guilty to anything you didn't do, by any means. That simply is not our purpose at all.

"Dorsciak: My girls were here. I might say this . . . They're real fine girls and I don't believe that they would lie under conditions of these and *I believe that to prevent a trial, to prevent them from being involved in a trial. I've been wrong for a long, long time I guess, but* . . .

"Conn: Do you have any . . .

"Dorsciak: You see my wife has been fighting with me for quite a while."

In his hearing in the trial court, petitioner's testimony disclosed the fact that, although he had confessed to acts of rape upon his daughters, the confession was not a matter of concern to him at the time he waived counsel and entered his plea of guilty to rape. In fact, he testified he did not know that a charge of rape had or would be filed against him until he appeared in the circuit court. This is disclosed by answers to questions propounded by his counsel:

"Q Did anyone from the time of your arrest until the time you pleaded guilty tell you that you were being charged with anything but contributing?

"A Would you say that again? I didn't hear it all.

"Q What did you understand you were being charged with when you walked in the courtroom?

"A Contributing. That is what they arrested me for.

"Q Up until the time you walked in the courtroom did anyone tell you that you were being charged with rape?

"A No, sir, not until I walked into the courtroom.

"Q When the judge or somebody else read the indictment to you in the courtroom you understood then you were being charged with rape?

"A Yes, that is what had me confused. Yes.

"Q Did you know what the maximum penalty for rape was at the time you pleaded guilty to that charge?

"A No, sir.

"Q Did you know what the maximum penalty was for contributing when you pleaded guilty?

"A No sir.

"* * * * *

"Q  What did you understand that you could say when the court asked you if you had anything to say prior to time he imposed sentence?

"A  There wasn't much I could say because I had already plead guilty to contributing.

"*  *  *  *  *

"Q  What were you guilty of in regard to your daughter Charlotte?

"A  I can answer that?

"THE COURT: Yes, you may.

"A  I am guilty of contributing, yes."

The trial court record is devoid of what acts petitioner committed upon his daughters that would constitute contributing to their delinquency. It could have been by having sexual relations with them, and he fully realized this fact.

As noted by the majority, whether petitioner's waiver of counsel and his plea of guilty was tainted by his prior confession is a question of fact. *State v. Keller,* 240 Or 442, 402 P2d 521. The facts set forth are those disclosed in the petitioner's own words, and show the true condition of his mind.

In *Gladden v. Holland,* 366 F2d 580, 583 (9th circuit, 1966), cited by the majority, that court stated:

"It is apparent to us from the totality of circumstances in our case that the conditions which rendered Holland's confession involuntary had not been substantially removed at the time he entered his plea of guilty. Within two or three hours after the coerced confession had been given, a state circuit judge received Holland's plea of guilty, entered a judgment of conviction thereon, and imposed a twenty-year sentence. He was without a friend in court. He was never out of the presence of law enforcement officers during this period."

And the circumstances most heavily relied upon are stated as follows:

> "* * * the speed with which Holland was brought before the Court after a sleepless night of constant interrogation, leave no room for the State's argument that his plea was free and voluntary. Holland's waiver of counsel and pleas of guilty were undoubtedly affected by the physical and mental after-effects of his harrowing night; * * *."

In the matter before us, the petitioner was not harrassed by constant questioning, rushed into court or held incommunicado. He was not brought before the circuit court until four days had elapsed, and a minister had visited him in jail.

Since the issue of the tainted confession was apparently not raised in the trial court, and if it had been the only answer that could have been given would have been adverse to the petitioner, I would affirm the judgment.