Argued and submitted July 24, 1985, resubmitted In Banc July 9, reversed and remanded for new trial December 10, 1986, reconsideration denied March 13, petition for review allowed April 7, 1987 (303 Or 261)

STATE OF OREGON,
*Respondent,*

*v.*

KENNETH E. FOSTER,
*Appellant.*

(J84-1475; CA A33631)

729 P2d 599

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

NEWMAN, J.

Warden, J., dissenting.

Deits, J., did not participate in this decision.

## NEWMAN, J.

Defendant appeals his conviction for felony murder. The Supreme Court reversed his previous conviction for the same offense, because of the state's improper use of polygraph evidence. *State v. Foster*, 296 Or 174, 674 P2d 587 (1983). Here, defendant asserts primarily that the court erred in not suppressing statements that he made to the police, which were used against him at trial. We agree and reverse and remand.

On August 6, 1981, the police discovered the body of Norwest in a field in Klamath County. He had been beaten and shot seven times in the head. Thereafter, the police received a number of tips indicating that four men were responsible for the murder: Snider, Walker, Jackson and defendant.

At about 8 p.m. on August 17, Klamath County Sheriff's Deputy Jenson was investigating a traffic accident in Chiloquin. As he was driving away, he saw two men chasing defendant along the highway. Defendant frantically waved down the officer and got into the car. He asked Jenson to help him. He claimed that the two men were trying to kill him, because he had been involved in the killing of Norwest. Jenson realized with whom he was talking and that defendant was wanted for questioning about the Norwest homicide. Defendant's face and shirt were covered with blood. Jenson turned him over to ambulance attendants, who took him to a hospital, where he was treated for injuries to his right knee, mouth and ribs.

Burkhart, the sheriff's investigator assigned to the Norwest homicide, met defendant shortly thereafter at the hospital. He spoke with the ambulance attendants and the doctor who was treating defendant. He then spoke with defendant, who indicated that he would talk to him. Burkhart tape recorded the subsequent interview, which commenced at 10 p.m. on August 17.

After giving defendant *Miranda* warnings, Burkhart, with the help of two other officers and a deputy district attorney, questioned defendant about his involvement in the homicide. During the interview, defendant admitted being with Walker, Jackson and Snider in a van when they picked up Norwest on the day he was killed. Defendant denied

knowing where the men were going when he got into the van. He initially denied seeing any guns and said that he did not shoot anyone. Defendant admitted being in the van when Norwest was fighting with Jackson. He also stated that Jackson had ordered Norwest out of the van and that he then heard gunshots from over a hill. Later in the interview, defendant said that he had picked up a rifle and it had discharged into a speaker in the van. Burkhart concluded the interview at 1 a.m. on August 18 and arrested defendant forty minutes later for kidnapping.

At 9 a.m. that morning, Burkhart met with Walker and his attorney and obtained more information about the homicide. He then returned to the hospital and again interviewed defendant. He read defendant *Miranda* warnings at the beginning of the interview. Defendant gave an account of events leading to the homicide that was similar to the one that he had given the night before. He admitted that, while riding in the van with the victim, he had accidentally shot him in the arm. After that interview, at 4 p.m., Burkhart filed a felony information that charged defendant with kidnapping.

On August 20, after defendant had been arraigned on the kidnapping charge and the court, apparently at his request, had appointed counsel to represent him, Burkhart received a telephone call from Crume, a friend of defendant's who had just visited him. Crume told Burkhart that defendant wanted to talk with him and tell everything he knew. Burkhart then phoned the jail and requested that defendant be brought to a holding cell, where Burkhart asked him if he wanted to talk. Defendant said that he did. Burkhart had him taken to the sheriff's office for the interview. He again tape recorded the interview and gave *Miranda* warnings at the outset. Burkhart asked if defendant understood his rights. The following then occurred:

" [Defendant:]   What does exercise these rights mean?

" [Burkhart:]   Okay, exercise means you can have your rights anytime you want to. You can stop talking or if you don't want to talk anymore, if you want your lawyer. Okay, do you understand those rights? Having these rights in mind do you wish to talk to me about the case?

" [Defendant:]   Yes.

" [Burkhart:] Okay, do you understand that I am tape recording this conversation?

" [Defendant:] Yes.

" [Burkhart:] All right. I received a call from Colleen Crume just a little while ago and she indicated you might have a desire to go over this with us again. Is that true?

" [Defendant:] Yes it is. I have a little bit more."

During the interview defendant admitted greater involvement in the homicide but still denied intentionally shooting the victim in the van and still claimed that the victim was killed by Snider and Jackson.

Defendant moved to supress his statements of August 17, 18 and 20. The court denied the motion, and the state used the statements at trial.[1] Defendant assigns the court's ruling on the motion to suppress as error. He argues that he made the statements involuntarily and without knowingly and intelligently waiving his *Miranda* rights and, accordingly, that the state's use of the statements violated Article I, section 12, of the Oregon Constitution and the Fifth Amendment. He also claims, with respect to the statements of August 18 and 20, that the police violated his right to counsel under Article I, section 11.[2]

We first examine defendant's state constitutional challenge to the use of his August 17 statement. The state has the burden to prove by the clear weight of the evidence that defendant's statement was made freely and voluntarily. *State v. Burdick*, 57 Or App 601, 605, 646 P2d 91 (1982). It must show that the statement was given "without inducement through fear or promises, direct or implied." *State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1980) (Citation omitted). In evaluating voluntariness, we must look at the totality of the circumstances. *State v. Cochran*, 72 Or App 499, 512, 696 P2d 1114 (1985). We are bound by the trial court's findings of historical fact, but we are not bound by its

---

[1] Burkhart testified to the contents of August 17 interview, and the tapes of the August 18 and August 20 interviews were played to the jury.

[2] On appeal defendant also challenges the state's use of his statements to Jenson, as well as the statements he made to Burkhart. At the hearing on the motion to suppress, however, defense counsel admitted that the statement to Jenson was admissible and, accordingly, defendant cannot raise the issue of its admissibility here. *State v. Hickmann*, 273 Or 358, 360, 540 P2d 1406 (1975).

conclusion of voluntariness, if we conclude that the facts do not support its conclusion under constitutional standards. *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968).

At the time of his first interview with Burkhart during the night of August 17-18, defendant was in the hospital. The following excerpts are indicative of the tenor of the questioning:

" [Defendant:] I never shot my cousin, I've lived with him for a long time now, —

"[Police:] Well, you're involved up to your neck in this, you're into it pretty deep. Do you know what we're talking about? Start thinking about the truth.

"Kenny, do you know what we're talking about? We're talking about murder. Uh huh. Out in a little park about ten miles out of Klamath.

"So don't play games with us and don't try to lead us down the path. We know a lot more than you think we know.

" [Defendant:] I don't even know nothing.

" [Police:] We want the truth, Ken. *Those people meant business tonight Kenny, and I think you realize that.*

"\* \* \* \* \*

" [Police:] Look, Kenny, we got some guys telling us some pretty serious stuff here about what you did so you better start telling us your side of the story. We can't help you with this kind of a story, can't do anything, can't investigate anything you're saying because you're not telling us the truth.

" [Defendant:] I don't know nothing, man.

" [Police:] Okay, carry it with you this way, carry it on your shoulders *and have the whole Indian community down on you because you're not man enough to tell us the truth.*

" [Defendant:] Oh, let them kill me, I don't care. I don't know nothin.

" \* \* \* \* \*

" [Defendant:] I didn't murder my brothers.

" [Police:] I think you know alot more than you're telling us. Kenny you know people out there are more of a threat to you right now than we are and you know it.

" [Defendant:] I don't care. ...I don't know what's going on. I'm going to find out.

" [Police:]   *You'll probably find out when they release you shortly and you walk out of here.*

" [Defendant:]   I can't walk.

" [Police:]   *You can walk, they've advised us that the extent of your injuries aren't anything that's going to keep you in here.*

"Let's start from the beginning, okay, you were at your house on 2177 Angle Street.

" [Defendant:]   That's not my house. I was just down for a visit.

"* * * * *

" [Police:]   I think you're sorry for what happened.

" [Defendant:]   They're going to kill me if I say who did it.

" [Police:]   No they won't, we won't let them. No, we're not going to let them. We won't let anything happen to you.

" [Defendant:]   There's too many that know.

" [Police:]   Kenny, why do you think that if you get into an accident up in Chiloquin and you wind up in the hospital - there are three detectives here - we don't cover accidents. *We know what's going to happen to you out there in the community. We know how those people feel.*

" [Defendant:]   I don't wanna be a snitch.

" [Police:]   *Just tell us, so we decide whether we need to give you protection or not.* We don't know if you need it.

" [Defendant:]   I do need it.

" [Police:]   Well, why don't you tell us a little bit of what you know so we can go contact the DA and tell him about it.

" [Defendant:]   Do I have to tell him my brother...

" [Police:]   You don't have to tell him anything. We're...

" [Defendant:]   I don't want to have to go to Court and have him know that I told on him...

" [Police:]   Do you think that you're the only one that's telling us anything Kenny? How do you think we can tell you a few things that we've mentioned in here...

" [Defendant:]   *I've never been in here like this you guys and I'm scared...*

" [Police:]   *I understand, I would be too, I'd be scared to death.*

" [Defendant:]   All I ever had was just a traffic citation, just open container.

" [Police:]   Okay, this was a dumb part on all you guys, it was a dumb thing to do, we understand that. But we can't investigate anything you tell us until we know we feel we're getting most of the truth from you.

" [Defendant:]   Please. ...sleep...I don't want to be in court...they've got plenty of help there in Salem too.

" * * * * *

" [Police:]   All I can do if you level with us, I'll go to the DA and talk to him about what you're asking for.

" [Defendant:]   I need to get out of this town and out of this state, let me try to walk? - I'll talk to the DA now.

" * * * * *

" [Defendant:]   I don't know what they were talking about. Cause I don't know what you guys are talking about ----, hey man, don't say I'm involved with this kind of shit. I got along with that guy, I really did, and now...even my mother's even down on me, even she threatened me.

" [Police:]   What did she say to you?

" [Defendant:]   Said she's gonna kill me.

" [Police:]   *Well don't you think that with all these threats you been getting on the outside that if we knew the whole truth that we could probably do better as far as keeping you in jail, you might be safer in jail."* (Emphasis supplied.)

Burkhart was assisted in his questioning by two other officers and, at times, by a deputy district attorney. Defendant, who was in the hospital for treatment, was unassisted by counsel or friends. He had been badly beaten by friends of the victim, two of whom were chasing him at the time Jenson picked him up. Although he had been given medication, he was still in pain. The trial court found that defendant was "extremely scared."

"He was frightened because he'd just been beaten up by a group of people [who were] angry with him over having been a participant in the death of [Norwest]. He was equally frightened of those who are allegedly involved in the death."

Furthermore, the court found that the police used defendant's fear to get him to talk to them and make incriminating

statements.[3] It held, however, that defendant's statements at the interview were voluntary, because the police did not create the fear.[4] That was error. The police were not passive recipients of defendant's fear-induced statements. They promised

---

[3] The court stated:

"The police in their interrogation repeatedly refer to the fact that they must have the total facts as to the death. So they say they have to have a clear understanding of whether or not his assertions are true, and they do use this to be able to get his confession with him.

"On the other hand, the police have nothing to do with the beating that took place, in fact, they protected him from that beating, at least Lance Jenson did when he picked him up. And, obviously, they had nothing to do with the fact that he was fearful of the other participants and what they would do to him if he did as he says, 'snitch.'

"\* \* \* \* \*

"\* \* \* I think he was extremely fearful for his life. However, the police had nothing to do with that. They did use it to help get him to confess, but they had nothing to do with it."

[4] At the suppression hearing, defendant testified:

"Q. Now, during the course of the questioning, did you express that you were afraid, that you felt that if you were turned loose out of the hospital that you would suffer further injury?

"A. Yes.

"Q. Did the police tell you that if you cooperated that they would see that you were made to be safe?

"A. Yes.

"Q. Did the police talk to you about talking to a District Attorney and making any kind of a deal with the District Attorney?

"A. Yes."

On cross examination he stated:

"Q. So you asked the police for protection; is that correct?

"A. From them that was there at the — at Melita's.

"Q. And the police sent you to the hospital.

"A. Yes.

"Q. And were you afraid of the police?

"A. No.

"Q. The police never threatened you?

"A. No.

"Q. The police never beat you up.

"A. No.

"Q. You were afraid of elements in the community.

"A. Yes.

"Q. You understood that, for example, if you went back into Melita's, you'd probably be in big trouble.

"A. Yes."

him protection only if he would cooperate and impliedly threatened to release him into the hostile community if he refused. Although the police were not responsible for defendant's fear, their manipulation of his fear constituted actual coercion. *See Dorsciak v. Gladden,* 246 Or 233, 241, 425 P2d 177 (1967).

> "A compelled confession is offensive not because the victim has a grievance against the police, but because coerced statements are not premises from which a civilized society will infer guilt." *State v. Mendacino, supra,* 288 Or at 236.[5]

Looking at the totality of the circumstances, we hold that defendant's statement during the night of August 17-18 was involuntary under Article I, section 12, *State v. Cochran, supra; State v. Capwell,* 64 Or App 710, 669 P2d 808 (1983), and, accordingly, the court's failure to suppress it was prejudicial error which requires reversal, whether or not defendant was in custody when he gave it. *State v. Ely,* 237 Or 329, 332, 390 P2d 348 (1964); *State v. Capwell, supra.*[6]

Because we remand for a new trial, we consider the admissibility of defendant's subsequent statements to Burkhart and his other assignments of error. The statement to Burkhart during the day of August 18 at the hospital was also inadmissible, because it was made under circumstances that were not sufficiently removed "in time and location to dissipate the pernicious effects" of previous improper police questioning. *State v. Mendacino, supra,* 288 Or at 237. Defendant made his second statement only a few hours after the first, in the same setting and to the same officer. He was still hurt and fearful. We hold that, under those circumstances, defendant's second statement was tainted by the first and, under Article I, section 12, the court should have suppressed it.[7] The court's

---

[5] Similarly, the United States Supreme Court has said:

"Thus, in cases involving involuntary confessions, this court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Blackburn v. Alabama,* 361 US 199, 206, 80 S Ct 274, 4 LEd 2d 242 (1960).

[6] Because of our conclusion we do not reach defendant's claim under the Fifth Amendment.

[7] Because we decide that his second statement to Burkhart was tainted by the first, we need not decide whether it was inadmissible for any other reason. Moreover, we do not reach defendant's federal constitutional claims with respect to this statement.

failure to do so was prejudicial error which also requires reversal.

■ ■ Defendant's third statement to Burkhart at the jail on August 20 was sufficiently independent of the first so that it was not tainted. After talking with his friend, Crume, defendant decided that he wanted to tell the "whole story."[8] Crume was not acting as an agent for the police. She called Burkhart and told him that defendant wished to speak with him and to tell him "everthing he knew." The police did not press defendant during the ensuing conversation. The inter- · view occurred 60 hours after defendant's initial statement in a different setting. He was under arrest and no longer faced the threat of imminent release into a hostile community. Although defendant's decision to give the statement may have been influenced by the fact that he had previously made incriminating statements to the police and his belief that those statements could be used against him, the circumstances by themselves do not taint his statement. *See State ex rel Juv. Dept. v. McCluskey,* 59 Or App 575, 652 P2d 812 (1982), *rev den* 294 Or 461 (1983). There was a sufficient break in the stream of events to insulate the statement from the effects of the prior coercion and, accordingly, it need not be suppressed as "tainted fruit of the poisonous tree." *See State v. Mendacino, supra,* 288 Or at 238.[9]

■ Defendant asserts, however, that, even if it is not tainted, the third statement should have been suppressed, because the police obtained it in violation of defendant's right to counsel under Article I, section 11.[10] We agree. At the time when he made the statement, he was in custody and had been

---

[8] Crume testified at the suppression hearing that, although Burkhart knew of her visit with defendant, Burkhart neither asked her to visit him nor gave her any instructions. When asked about her discussion with defendant she testified:

"Q And after you told Kenny about the feelings in the community and doing someone else's time, and that, in fact, he should tell the truth, then what was his response to that?

"A His response was that he was going to tell whoever he talked to what happened."

[9] This is true under both the state and federal constitutions.

[10] Article I, section 11, provides:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."

arraigned on the kidnapping charge, and counsel had been appointed to represent him on that charge. However, he had not yet talked to his attorney. In *State v. Sparklin,* 296 Or 85, 672 P2d 1182 (1983), the court stated:

> "Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend. No waiver of that right may occur until defendant has consulted with his attorney. In the smallest civil matter an attorney and his or her investigator are restricted in their contact with a represented party. We can certainly require no less of prosecutors or police in criminal matters. A defendant may, of course, volunteer statements, but this must be on his own initiative and not in response to questioning. *See State v. Beaver,* 248 Or 101, 432 P2d 509 (1967). After consultation with his attorney the accused may choose to proceed alone. We have outlined elsewhere the necessary disclosures in such a case. *State v. Mains,* 295 Or [640, 645, 669 P2d 1112 (1983)]." 296 Or at 93. (Footnote omitted.)

Here, Burkhart contacted defendant after Crume had told him that defendant wished to speak to him. Burkhart knew at that time that defendant had been arraigned and that the court had appointed an attorney for him. He also knew that defendant wished to speak to him about the crime with which he was charged. After Crume spoke to him, Burkhart telephoned the jail and arranged for the police to bring defendant from his cell to the holding cell. There he asked defendant if he wanted to talk to him and, when defendant answered affirmatively, Burkhart took defendant to the sheriff's office and conducted the interview there. We read the language in *Sparklin* to mean that, before he contacted defendant, Burkhart should have notified defendant's attorney that he intended to contact his client and should have given the attorney a reasonable opportunity to attend. The state did not show that Burkhart, or any other person on behalf of the police, had at any time notified the attorney and given him an opportunity to attend the interview. Moreover, the state did not show that defendant had in any event consulted with his attorney before the interview.

In these circumstances, therefore, defendant could not effectively waive his right to the assistance of counsel.

Accordingly, even if defendant initiated the interview through Crume, Burkhart took defendant's statements in violation of Article I, section 11. The statements must be suppressed along with the earlier statements.

■■ Defendant also assigns as error that the court admitted color photographs of the victim's body. *Post mortem* photographs are admissible if they are probative of a fact in issue and their probative value is not outweighed by their prejudicial impact. *State v. Flett,* 234 Or 124, 127, 380 P2d 634 (1963); *State v. Reams,* 47 Or App 907, 914, 616 P2d 498 (1980), *aff'd* 292 Or 1, 636 P2d 913 (1981). Defendant was charged with first degree kidnapping, which required the state to prove that he kidnapped the victim "with the purpose of causing physical injury." The extent of the injuries that the victim received in the van was relevant. The court only allowed admission of photographs that were probative of that issue and did not abuse its discretion in concluding that their probative value outweighed their prejudicial impact.[11]

Reversed and remanded for a new trial.

**WARDEN, J.,** dissenting.

The majority reverses the trial court, because it concludes that defendant's statements made to police on August 17 and 18, 1981, were involuntary. I disagree and, therefore, dissent.

The general rule is that "[v]oluntariness is determined by the totality of the circumstances; police trickery or false statements, alone, may not be sufficiently coercive to result in involuntariness." *State v. Burdick,* 57 Or App 601, 606, 646 P2d 91 (1982). A statement is not voluntary if it is made as a result of police conduct which overbears the defendant's will. *State v. Cochran,* 72 Or App 499, 512, 696 P2d 1114 (1985). Viewing the totality of the circumstances in this case, the actions of the police were not sufficient to overbear defendant's will and render his statements of August 17 and 18 involuntary.

The majority concludes that the police manipulated

---

[11] In his final assignment, defendant asserts that the court erred in not allowing his attorney to withdraw from the case. We do not know if the issue will come up again on retrial and make no comment on the assignment.

defendant's fear so that the questioning constituted actual coercion. Defendant's fear was real, but it was not fear of the police. Although, in an effort to encourage defendant to talk about the murder, Officer Burkhart referred to the source of his fear several times in the interrogation, he did not augment that fear in order to overbear defendant's will or to impair his ability to make a voluntary confession.

Neither did the police "impliedly threaten to release him into the hostile community if he refused [to cooperate]," as the majority states. Defendant had been advised of his *Miranda* rights, but he had not been arrested and was not in police custody on August 17; he was in a hospital. The police had no power either to hold him or to release him on that date. It is not a normal police function to house or guard an able-bodied individual who is not under arrest simply because the individual is afraid for his safety for some real or imagined reason. The police lack the resources to provide that kind of protection for every citizen who might request it. They had a right, and perhaps a duty, to inquire into the causes of defendant's fears, for which he was requesting police protection.

The trial court correctly found that defendant's statements both before and after his arrest on August 18 were voluntary, considering the "totality of the circumstances." The questioning did not occur in the coercive environment of a police station but at the hospital and was not of unreasonably long duration. The trial court found that defendant was not impaired physically or mentally so that he was unable to make a voluntary confession. The interviews were taped, allowing the trial court to hear the manner and tone of the questions and answers. Finally, defendant had been properly advised of his *Miranda* rights. (He does not claim otherwise on appeal.) He could have broken off questioning at any time by exercising his right to remain silent or by requesting an attorney. He did neither.

The police did not create defendant's fear. In fact, on August 17, they had protected him from people whom he feared, because those people sought to get even with him for his part in the Norwest murder. Part of his fear arose from the possible retaliation of the others involved in the murder if he "snitched" on them; the police offered to protect him from

those he feared, if he would discuss the murder. That is not impermissible police activity and does not render defendant's statements of August 17 and 18 involuntary.[1]

I have reviewed the 91 pages of single-spaced transcript of the questions and answers in defendant's taped statement to police, which began at 10:11 p.m. on August 17, 1981, and ended at 12:55 a.m. on August 18. From those 91 pages, the majority has gleaned a few phrases that it relies on as coercive police conduct. The essence of the conversation between defendant and the police officers was that they believed that defendant knew more about Norwest's murder than he was telling them, that both defendant and the officers believed defendant to be in some danger from others because of his part in the murder, that defendant wanted police protection, that the officers told defendant that they could probably protect him best if he were in jail and that, if he was sentenced to a term of imprisonment for his part in the murder, they could help to see to it that he was encarcerated in another state. Defendant was not in custody. He had been advised of his *Miranda* rights and had neither asserted the right to remain silent nor the right to the aid of counsel.

ORS 136.425(1) provides, in part:

"A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats * * *."

I would hold that the reference to "threats" has to be to threats by police or those acting as police agents. That a

---

[1]The cases cited by the majority, *Dorsciak v. Gladden,* 246 Or 233, 425 P2d 177 (1967); *State v. Cochran, supra;* and *State v. Capwell,* 64 Or App 710, 669 P2d 808 (1983), involve situations more coercive than those in this case. In *Capwell,* the police made implied promises of more lenient treatment if the defendant would confess. In *Dorsciak,* the defendant never had the advice of counsel, although he had requested it; he was told that the judge would be easier on him and he would be more likely to receive psychiatric assistance if he confessed; and the police emphasized that, if he went to trial, his daughters would receive a great deal of unfavorable publicity. In *Cochran,* the police used four deceptive techniques during a seven hour interrogation: (1) they told the defendant that "If I thought you'd killed her, I wouldn't do this," and then threw his signed *Miranda* rights card in the wastebasket; (2) they used the "good-guy bad-guy" routine; (3) they told him that blood on his hands was causing them to glow orange under a black light; and (4) they tricked him into believing that he had supernatural abilities that could be used to find the true killer. The facts in this case do not reflect the level of police conduct found in any of those cases and are not sufficient to justify suppression.

member of the Mafia goes to the police and admits his own complicity in crimes, because he fears other Mafia members, cannot make his incriminating statements inadmissible. That children fear the wrath of their parents, incurred because of crimes they have committed, and therefore confess to police cannot make the confession inadmissible as evidence.

The rules relevant to the admission of confessions were discussed by the Supreme Court in *State v. Smith,* 301 Or 681, 725 P2d 894 (1986). The test is whether the promise or threat inducing the confession is one that might induce a *false* confession. The object is not to exclude confessions of the truth but to avoid the possibility of confessions of guilt from those who are innocent. *State v. Smith, supra,* 301 Or at 692. The key is whether any promise or threat was made "which would elicit a false confession." 301 Or at 693. I submit that there is nothing in the portions of defendant's interrogation by police officers on August 17, 1981, that is quoted by the majority that could lead us to conclude that it would elicit a false confession.

I agree with the majority that statements made to police on August 20, however, should have been suppressed, as violative of his right to counsel under Article I, section 11, of the Oregon Constitution. However, I would still affirm the conviction, because the error was harmless when viewed in the light of all of the evidence. Or Const, Art VII (amended), § 3; *State v. Olds,* 35 Or App 305, 313, 581 P2d 118, *rev den* 284 Or 80a (1978). On August 20, defendant admitted greater involvement in the homicide than he had previously, but even without that statement, the admissible evidence of guilt, which included the testimony of a co-defendant, was so substantial and convincing that its suppression would not have changed the trial result.[2] *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973); *see State v. Mains,* 295 Or 640, 669 P2d 1112 (1983). Their admission was harmless beyond a reasonable doubt. *Chapman v. California,* 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967). I would affirm the trial court. Therefore, I dissent.

---

[2]From my examination of the record, I am satisfied that the evidence of defendant's guilt was so overwhelming, that the trial result would have been the same if more of defendant's statements made to Burkhart on August 17, 18 and 20 had been admitted in evidence.

Warren, Van Hoomissen and Rossman, JJ., join in this dissent.