Argued and submitted May 13, Court of Appeals reversed and trial court judgment reinstated June 23, 1987

STATE OF OREGON,
*Petitioner on review,*

*v.*

KENNETH E. FOSTER,
*Respondent on review.*

(CC J84-1475; CA A33631; SC S33671)

739 P2d 1032

▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition for review were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for respondent on review.

JONES, J.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Gillette, J., filed a concurring opinion.

Linde, J., filed a dissenting opinion.

## JONES, J.

This case presents the questions whether defendant's statements made during police interrogation were obtained in violation of ORS 136.425(1), which prohibits the state from introducing evidence of a confession or admission of a defendant if "made under the influence of fear produced by threats"; whether any of defendant's statements were made in violation of his state or federal constitutional rights against self-incrimination;[1] or whether an otherwise voluntary confession is inadmissible under the right to counsel provision of Article I, section 11,[2] when, after arraignment and appointment of counsel, defendant, through a third person, initiates police questioning. We answer each question in the negative.

In a 5-to-4 decision, the Court of Appeals reversed defendant's conviction for felony murder and remanded the case for a new trial, holding that two of defendant's statements were involuntary and a third statement violated defendant's state constitutional right to counsel. *State v. Foster,* 82 Or App 730, 729 P2d 599 (1986). We allowed the state's petition for review. We reverse the Court of Appeals and reinstate defendant's judgment of conviction.

The Court of Appeals recited the following facts primarily from defendant's brief:

"On August 6, 1981, the police discovered the body of Norwest in a field in Klamath County. He had been beaten and shot seven times in the head. Thereafter, the police received a number of tips indicating that four men were responsible for the murder: Snider, Walker, Jackson and defendant.

"At about 8 p.m. on August 17, Klamath County Sheriff's

---

[1] Article I, section 12, of the Oregon Constitution provides in pertinent part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

The Fifth Amendment to the United States Constitution provides in relevant part:

"No person shall be * * * compelled in any criminal case to be a witness against himself * * *."

[2] Article I, section 11, of the Oregon Constitution provides in pertinent part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."

Deputy Jenson was investigating a traffic accident in Chiloquin. As he was driving away, he saw two men chasing defendant along the highway. Defendant frantically waved down the officer and got into the car. He asked Jenson to help him. He claimed that the two men were trying to kill him, because he had been involved in the killing of Norwest. Jenson realized with whom he was talking and that defendant was wanted for questioning about the Norwest homicide. Defendant's face and shirt were covered with blood. Jenson turned him over to ambulance attendants, who took him to a hospital, where he was treated for injuries to his right knee, mouth and ribs.

"Burkhart, the sheriff's investigator assigned to the Norwest homicide, met defendant shortly thereafter at the hospital. He spoke with the ambulance attendants and the doctor who was treating defendant. He then spoke with defendant, who indicated that he would talk to him. Burkhart tape recorded the subsequent interview, which commenced at 10 p.m. on August 17.

"After giving defendant *Miranda* warnings, Burkhart, with the help of two other officers and a deputy district attorney, questioned defendant about his involvement in the homicide. During the interview, defendant admitted being with Walker, Jackson and Snider in a van when they picked up Norwest on the day he was killed. Defendant denied knowing where the men were going when he got into the van. He initially denied seeing any guns and said that he did not shoot anyone. Defendant admitted being in the van when Norwest was fighting with Jackson. He also stated that Jackson had ordered Norwest out of the van and that he then heard gunshots from over a hill. Later in the interview, defendant said that he had picked up a rifle and it had discharged into a speaker in the van. Burkhart concluded the interview at 1 a.m. on August 18 and arrested defendant forty minutes later for kidnapping.

"At 9 a.m. that morning, Burkhart met with Walker and his attorney and obtained more information about the homicide. He then returned to the hospital and again interviewed defendant. He read defendant *Miranda* warnings at the beginning of the interview. Defendant gave an account of events leading to the homicide that was similar to the one that he had given the night before. He admitted that, while riding in the van with the victim, he had accidentally shot him in the arm. After that interview, at 4 p.m., Burkhart filed a felony information that charged defendant with kidnapping.

"On August 20, after defendant had been arraigned on the kidnapping charge and the court, apparently at his request, had appointed counsel to represent him, Burkhart received a telephone call from Crume, a friend of defendant's who had just visited him. Crume told Burkhart that defendant wanted to talk with him and tell everything he knew. Burkhart then phoned the jail and requested that defendant be brought to a holding cell, where Burkhart asked him if he wanted to talk. Defendant said that he did. Burkhart had him taken to the sheriff's office for the interview. He again tape recorded the interview and gave *Miranda* warnings at the outset. Burkhart asked if defendant understood his rights. The following then occurred:

" '[Defendant:] What does exercise these rights mean?

" '[Burkhart:] Okay, exercise means you can have your rights anytime you want to. You can stop talking or if you don't want to talk anymore, if you want your lawyer. Okay, do you understand those rights? Having these rights in mind do you wish to talk to me about the case?

" '[Defendant:] Yes.

" '[Burkhart:] Okay, do you understand that I am tape recording this conversation?

" '[Defendant:] Yes.

" '[Burkhart:] All right. I received a call from Colleen Crume just a little while ago and she indicated you might have a desire to go over this with us again. Is that true?

" '[Defendant:] Yes it is. I have a little bit more.'

"During the interview defendant admitted greater involvement in the homicide but still denied intentionally shooting the victim in the van and still claimed that the victim was killed by Snider and Jackson." 82 Or App at 732-34.

Defendant moved to suppress his statements of August 17, 18 and 20. The trial court denied the motion, and the state used the statements at trial.

On appeal, defendant assigned the trial court's ruling on the motion to suppress as error. He argued to the Court of Appeals that he made the statements involuntarily and without knowingly and intelligently waiving his *Miranda* rights and, accordingly, that the state's use of the statements violated Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. He also

claimed that the police violated his right to counsel under Article I, section 11, with respect to the statements of August 18 and 20.

The Court of Appeals found that the police used defendant's fear of community reprisal to get him to talk to them and to make incriminating statements and that defendant's statements made at the interview were involuntary even though the police did not create the fear. The majority opinion stated:

> "* * * The police were not passive recipients of defendant's fear-induced statements. They promised him protection only if he would cooperate and impliedly threatened to release him into the hostile community if he refused. Although the police were not responsible for defendant's fear, their manipulation of his fear constituted actual coercion. [Citation omitted.]" 82 Or App at 738-39.

The Court of Appeals held that "[t]he statement to Burkhart during the day of August 18 at the hospital was also inadmissible, because it was made under circumstances that were not sufficiently removed 'in time and location to dissipate the pernicious effects' of previous improper police questioning." 82 Or App at 739.

The Court of Appeals then addressed defendant's third statement to Burkhart at the jail,.noting that this interview occurred 60 hours after defendant's initial statement in a different setting, that is, when he was under arrest and no longer faced the threat of imminent release into a hostile community. Nevertheless, the Court of Appeals held that this statement should have been suppressed because the police obtained it in violation of defendant's right to counsel under Article I, section 11, reasoning that at the time when he made the statement defendant was in custody, had been arraigned and counsel had been appointed to represent him. However, he had not yet talked to his attorney. 82 Or App at 840-42. The Court of Appeals relied on statements appearing in this court's case of State v. Sparklin, 296 Or 85, 93, 672 P2d 1182 (1983):

> "Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing

the defendant on that charge is notified and afforded a reasonable opportunity to attend. No waiver of that right may occur until defendant has consulted with his attorney. In the smallest civil matter an attorney and his or her investigator are restricted in their contact with a represented party. We can certainly require no less of prosecutors or police in criminal matters. A defendant may, of course, volunteer statements, but this must be on his own initiative and not in response to questioning. *See State v. Beaver,* 248 Or 101, 432 P2d 509 (1967). After consultation with his attorney the accused may choose to proceed alone. We have outlined elsewhere the necessary disclosures in such a case. *State v. Mains,* 295 Or [640, 645, 669 P2d 112 (1983)]." (Footnote omitted.)

The Court of Appeals recited that Burkhart contacted defendant after Crume had told him that defendant wished to speak to him and that Burkhart knew at that time that defendant had been arraigned and had a court-appointed attorney. After Crume spoke to him, Burkhart telephoned the jail and arranged for the police to bring defendant from his cell to the holding cell. There he asked defendant if he wanted to talk to him and, when defendant answered affirmatively, Burkhart took defendant to the sheriff's office and conducted the interview there.

The Court of Appeals read the above-quoted language from *Sparklin* to mean that, before he communicated with defendant, Burkhart should have notified defendant's attorney that he intended to talk to defendant and should have given the attorney a reasonable opportunity to attend. The court held that defendant could not effectively waive his right to the assistance of counsel: "Accordingly, even if defendant initiated the interview through Crume, Burkhart took defendant's statements in violation of Article I, section 11." 82 Or App at 742. Thus, the Court of Appeals suppressed all three statements. We now turn to an examination of whether any or all of the statements should have been suppressed.

## THE AUGUST 17-18 STATEMENTS

Were defendant's statements obtained in violation of ORS 136.425(1) when the police referred to community threats while interrogating defendant, or were defendant's statements compelled by the police in violation of his state or federal constitutional rights against self-incrimination?

ORS 136.425(1) was originally codified in General Laws of Oregon, chapter 22, section 214, page 478 (Deady 1845-1864). Section 214 of the Deady Code provided:

"A confession of a defendant, whether in the course of judicial proceedings, *or to a private person,* cannot be given in evidence against him when made under the influence of fear, produced by threats * * *." (Emphasis added.)

The present code provides in pertinent part:

"A confession or admission of a defendant, whether in the course of judicial proceedings *or otherwise,* cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats * * *." (Emphasis added.)

We find no legislative history which reveals why the reference to "a private person" was dropped. However, we recently commented in a footnote in *State v. Jancsek,* 302 Or 270, 284 n 7, 730 P2d 14 (1986), that this statute is an expression of the common law rule against coerced confessions. That comment in *Jancsek* is based on the statement of this court to the same effect in *State v. Wintzingerode,* 9 Or 153 (1881), the first case interpreting the original statute.

■ Applied to the facts of this case, ORS 136.425(1) would prohibit the admission in evidence of any out-of-court confession or admission of defendant made to the police during interrogation prior to the commencement of judicial proceedings if the statements were made under the influence of fear produced by threats, or of promises,[3] made by anyone.

■ The state constitutional provision, Article I, section 12, applies only against governmental action of some officer or agency of the state or one of its subdivisions. It has no application to the action of private individuals who are not employed by or acting under the orders or directions of, or in concert with, such an officer or agent. *See State v. Jancsek, supra; State v. Barrett,* 121 Or 57, 62, 254 P 188 (1927).

It is difficult to separate a discussion of the statute from that of the constitutional provision because defendant

---

[3] *State v. Wintzingerode,* 9 Or 153, 161-62 (1881), interpreted the original statute, and held that although the statute excluded only confessions induced by threats, "the common law rules, governing the admissibility of confessions [those induced by promises or intimations of favor] are still in force in this state."

never directly relied on the statute in the trial court or in the Court of Appeals. The trial court file index does not show any written motion to suppress except a motion for an omnibus hearing, in which defendant moved to suppress his statements without stating any grounds and without citing any authority. In his appellant's brief to the Court of Appeals, defendant assigned as error the denial of defendant's motion to suppress his statements, but the brief contains nothing to indicate the text or grounds of the motion. Defendant claims only that his state and federal constitutional rights have been infringed.

The state's responding brief does not make any reference to ORS 136.425(1), and the Court of Appeals majority opinion does not mention that statute. The statute is mentioned for the first time in the Court of Appeals dissent. However, in its petition for review to this court, the state does refer to ORS 136.425(1). We could refuse to consider this statute because defendant failed to raise it below. Nevertheless, we will consider the possible application of the statute to this case in order to follow our standard procedure first to examine if there has been any statutory violation before considering any state or federal constitutional violation. *See State v. Davis,* 295 Or 227, 240, 666 P2d 802 (1983); *State v. Thompson,* 294 Or 528, 531, 659 P2d 383 (1983) ("Although the arguments and opinions below did not distinguish between these sources [constitutional and statutory], to the extent that statutory law disposes of a case a court has no occasion to reach a constitutional issue."); *State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979) ("It is basic that determination of Oregon statutory law is antecedent to any claim under the federal constitution, because the State does not violate any of a defendant's constitutional rights if, under this court's interpretation of the controlling statutes, those rights are in fact protected. Nor can the parties foreclose an appellate court from consulting statutory law simply by limiting their arguments on appeal to constitutional issues.").

As mentioned, the Court of Appeals held that defendant's statements of August 17-18, 1981 involuntary because it considered that the police used defendant's fear of community reprisal to get him to talk and to make incriminating statements, even though the police did not create the fear. The majority opinion quoted several statements made by the police to defendant to the effect that the police could not

protect him from the other parties to the crime or the hostile members of the community unless he told them the whole truth about what happened. The Court of Appeals' ultimate conclusion that the statements were involuntary was directly opposite to that of the trial court. The trial court stated:

"I don't find that there is any fraud. There is some talk in there about protecting him from members of the Indian community. There is some talk about talking to the DA, but those things are so vague so really not to merit other than just passing mention. Frankly, a police officer couldn't if he wanted to keep someone in jail because it's up to the magistrate at arraignment to set a security amount at any rate, so the officer didn't even have that legal authority.

"There's no sign as far as I can tell of physical coercion. The interrogation lasted off and on for some two hours and 44 minutes the first night, 27 minutes the next day — at least that's what's on the tape — and I haven't bothered to calculate the last one, but I think it's somewhere in the neighborhood of that second one. The place of interrogation was the hospital in the first two cases and the same in the latter. I don't see anything there which would overbear on a person's normal capacities.

"I think the one that really merits discussion * * * is the mental part of it. * * * [I]t's true the officers were aware that the community, particularly the Indian community in Klamath Falls was upset about this. It goes without saying there was some upset because that's the reason why Mr. Foster was in the emergency room.

"I think the point is this: Were the officers saying something more than what they were entitled? Were they telling Mr. Foster something that he didn't already know, and probably since Mr. Foster had been the one running down the road being chased by those other two fellows he probably was, and obviously was more aware of those feelings in the community than anyone else.

"After weighing all of those factors on that particular issue it is my finding that the officers did not impair his capacity for self-determination even though they did remind him on more than one occasion about what was happening in the community.

"So, I do find * * * that the statement made on August the 17th is admissible. I think by the same analysis the statement made on August the 18th is admissible."

The question whether defendant was the recipient of threats from anyone, by the community or by the police officers' conduct, was not regarded by defendant as important enough even to argue in his brief to the Court of Appeals on the issue of voluntariness of his statements. In the Court of Appeals, defendant based his challenge that his statements were involuntary on the fact that he had been injured and was being treated in the hospital emergency room. His entire argument on the voluntariness issue was as follows:

"Defendant submits that none of his statements were voluntary. He was injured and being treated in a hospital emergency room on August 17. He was still in the hospital on August 18, when Officer Burkhart returned and resumed interrogating defendant. The subsequent jail interrogation was clearly a product of the previous two interrogations; it was also involuntary. The trial court's finding of voluntariness simply is not supported by the record."

But the findings of the trial judge as to this contention were supported by the record. The trial court specifically found that defendant was not physically or mentally impaired and there was nothing about the hospital environment that rendered the statements involuntary. We observe that the location of the two interviews, a hospital, was not a coercive environment. This was not an interrogation in a jail cell nor were the statements obtained as the result of questioning conducted in a police station or any other police-dominated environment.

Further, the trial court findings based on the record justified the ultimate conclusion that the totality of the circumstances demonstrated that defendant's will was not overborne, his capacity for self-determination was not critically impaired, and that he experienced no unlawful coercion by the state and that his statements were voluntary. That finding and conclusion should not have been disturbed by the Court of Appeals.

We agree with the majority in the Court of Appeals that the police should not have made any comments about releasing defendant into a hostile environment nor made reference to real or fancied threats by parties to the crime or by members of the community in an effort to make defendant talk. It makes no difference whether the threats were made by

members of the community and not by the police if the police converted those community threats into their own threat to release defendant back into the hostile community if he did not talk to them. However, these were isolated comments made during very lengthy interrogations, which the Court of Appeals majority excerpted from the voluminous record. These comments did not by themselves render the statements made on August 17-18 involuntary.

In *State v. Warner,* 284 Or 147, 585 P2d 681 (1978), and *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), this court set out a rule for appellate review of the voluntariness of admissions and confessions. If the evidence sustains historical factual findings, those findings will not be disturbed on appellate review. "If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, e.g., voluntariness or lack thereof, made by the trial court or jury." *Warner,* 284 Or at 156-57 (quoting *Ball* 250 Or at 487-88). Whether these historical facts are sufficient to sustain a finding of voluntariness which meets constitutional standards is another question. In other words, neither the Court of Appeals nor this court is bound by a trial court's finding of voluntariness if we believe the historical facts upon which such finding is based are insufficient to meet constitutional standards. *Warner,* 284 Or at 156-57.

In the case before us, the evidence supports the trial judge's historical factual findings and his conclusions that the statements of defendant were not made under the influence of fear produced by threats and that defendant was not compelled by the police to testify against himself.

Therefore, in the case at bar, defendant's statements made during police interrogations were not obtained in violation of ORS 136.425(1), of any Oregon state constitutional provision or of the Fifth Amendment to the United States Constitution. The Court of Appeals erred in suppressing the August 17-18 statements.

## THE AUGUST 20 STATEMENTS

In the August 17 statement, defendant admitted being with the other parties to the crime but denied shooting

anyone. During the August 18 interrogation, he claimed to have accidentally shot the victim in the arm. In the August 20 statement, defendant not only admitted being with the other parties to the crime and that he shot the victim but that he did so at the direction of a co-defendant who ordered him to shoot Norwest and that he shot Norwest in response to that command. The trial court and the Court of Appeals found that the August 20 statement was not tainted by any statements he made on August 17 or 18 and that it was voluntary. We agree.

The question remains whether defendant's statements of August 20 were made in violation of his right to counsel under Article I, section 11, of the Oregon Constitution?

As previously mentioned, the Court of Appeals suppressed the August 20 statements based on its interpretation of this court's decision in *State v. Sparklin, supra.* The Court of Appeals misinterpreted the *Sparklin* decision. In prohibiting police interrogation of a defendant after the appointment or retention of counsel, this court was careful in *Sparklin* to note that "[a] defendant may, of course, volunteer statements, but this must be on his own initiative and not in response to questioning." 296 Or at 93. In support of this proposition, the court cited *State v. Beaver,* 248 Or 101, 432 P2d 509 (1967), wherein the defendant, after appointment of counsel, initiated contact with the police and confessed. The same form of initiation occurred here when, according to the trial court's findings, defendant asked Colleen Crume to contact the police so that he could give a full statement of his involvement in the crime.

*Sparklin* affirmed the continuing validity of *Beaver* under the Oregon Constitution. The fact that defendant went through a private intermediary to initiate his contact with the police in no way rendered his initiation ineffective. The defendant in *Beaver* employed a similar third party, a jailer. Both the defendant here and in *Beaver* decided to speak with the police without any request on the part of the police. By doing so, the defendant "volunteer[ed] statements * * * on his own initiative and not in response to questioning." *State v. Sparklin, supra,* 296 Or at 93; *see State v. Beaver, supra; see also State v. Kell,* 303 Or 89, 734 P2d 334 (1987).

The statements made by this defendant to the police

did not violate any Oregon statute, state constitutional provision or federal constitutional provision. The Court of Appeals is reversed, and the trial court judgment is reinstated.

**GILLETTE, J.,** concurring in part and specially concurring in part.

I join in the court's disposition of this case and in most of its analysis supporting that disposition. However, I believe the peculiar posture of the defendant's claim in the Court of Appeals concerning his statements of August 17-18 calls for a more summary disposition than that given it by the majority. I therefore write separately.

As noted by the majority, the only claim this defendant advanced *in the Court of Appeals* concerning his statements of August 17-18 was that the statements were involuntary because he was in hospital. 303 Or 518 at 527. *That* argument is not well taken, in view of the findings of fact made by the trial judge and fully supported by the record. The Court of Appeals should have confined itself to resolving that issue, and so should we. The balance of the majority's discussion on the voluntariness of the August 17-18 statements in this court may be correct — although I think the issue is very close — but I would not carry on that part of the discussion at all.

I agree with the majority's discussion of the August 20 statements.

**LINDE, J.,** dissenting.

If this case turned on whether the evidence concerning defendant's statements to Officer Burkhart on the night of August 17-18, 1981, coupled with the trial judge's comments and the factual inferences drawn on appeal under *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), and *State v. Warner,* 284 Or 147, 585 P2d 681 (1978), support the version of events on which defendant's statements were admitted against him, I would not dissent. The extent to which *Ball v. Gladden* and *State v. Warner* dispense with any need for trial court findings on disputed facts may need reexamination someday, but not in this case.

The problem in this case, however, is that the trial judge examined the circumstances and ruled on the use of

defendant's statements to Burkhart under an assumption that their "voluntariness" depended on whether the police officers coerced defendant into making his statements. The trial judge stated that he found no "fraud" or physical coercion on the part of the officers. He found that the officers' talk about asking the district attorney to protect the defendant if he "snitched" were vague. The judge noted that the officers could not keep defendant in jail even if they wanted to. Whether they could, of course, is immaterial if defendant thought that this could be done. Finally, the judge stated:

> "I think the point is this: Were the officers saying something more than what they were entitled? Were they telling Mr. Foster something that he didn't already know, and probably since Mr. Foster had been the one running down the road being chased by those other two fellows he probably was, and obviously was more aware of those feelings in the community than anyone else.
>
> "After weighing all of those factors on that particular issue it is my finding that the officers did not impair his capacity for self-determination even though they did remind him on more than one occasion about what was happening in the community.
>
> "So, I do find after an analysis of those four factors that the statement made on August the 17th is admissible. I think by the same analysis the statement made on August the 18th is admissible."

The judge admitted defendant's statements because *the officers* did not impair defendant's capacity for self-determination, although they reminded him more than once of his fear of retribution by others, as the Court of Appeals set out in more detail in its opinion.

Now this court correctly points out that Oregon law requires exclusion of an admission or confession if it results from threats or inducements by anyone, not only by state officers. The majority then would hold that the "isolated comments" of the interrogating officers quoted by the Court of Appeals, though improper, "did not by themselves render the statements made on August 17-18 involuntary." 303 Or at 529. I do not see how this court is in a position to make that determination.

The Court of Appeals thought the opposite. The

majority in this court says that the evidence supports not only the trial judge's findings of historical facts but also his "conclusions that the statements of defendant were not made under the influence of fear produced by threats." 303 Or at 520. I do not find that conclusion stated by the trial judge. What the majority quotes at length and what I have briefly noted above shows that the judge focused on what the police did, not on whether defendant's confession resulted from fear. So did the majority and the dissenters in the Court of Appeals. The trial court did not find that defendant was not frightened or that his fear, coupled with his injured and weakened condition in the hospital and with the officers' reminder of what awaited him outside, did not influence him to confess. The judge thought the test was whether *the officers* impaired defendant's capacity for self-determination.

The trial judge's finding therefore cannot serve the majority as the basis for reversing the decision of the Court of Appeals. If this court believes that the Court of Appeals determined facts beyond its scope of review even given the broader understanding of the test of fear or inducement as we now have stated it, I see nothing for us to do but to return the case to the circuit court to determine whether defendant's statements on August 17-18 were admissible under that test. This court cannot well reverse the Court of Appeals for drawing factual inferences and conclusions from the record and then go on simply to make the opposite findings itself.

I therefore dissent from the decision in this case.